**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| **GABRIEL BRANDON GARZA,** | |
| **Plaintiff,** | **Civil Action No.  1:23-cv-00097** |
| **v.** | |
| **UNITED PARCEL SERVICE, INC.,** | **Jury Trial Demanded** |
| **Defendant.** | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully submitted,

SHELLIST LAZARZ SLOBIN LLP

*/s/ Dorian Vandenberg-Rodes*
Todd Slobin
State Bar No. 24002953
tslobin@eeoc.net
Dorian Vandenberg-Rodes
State Bar No. 24088573
drodes@eeoc.net
11 Greenway Plaza, Suite 1515
Houston, Texas 77046
(713) 621-2277 (Tel)
(713) 621-0993 (Fax)

ATTORNEYS FOR PLAINTIFF

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................. iii

I.    Issues in Dispute .......................................................................................................... 1

II.   Undisputed Facts .......................................................................................................... 2

III.  Argument ....................................................................................................................... 8

    A.   Standard of Review....................................................................................... 8

    B.   Disability discrimination standard................................................................ 8

        1.   Plaintiff had a disability. ....................................................... 9

        2.   Plaintiff was qualified at all relevant times to work as driver. .................. 9

            a.   At all relevant times, Garza could have completed training
with reasonable accommodations................................................. 10

            b.   At all relevant times, Garza could have been reasonably
accommodated to meet all communication requirements
for the position. ......................................................................... 10

            c.   At all relevant times, Garza met the job-related requirement
of being able to obtain a DOT card with a hearing exemption
during onboarding. .................................................................... 11

        3.   UPS discriminated against Garza, refusing to allow him to work
As a driver, because of his disability. ...................................... 15

        4.   UPS's affirmative defense of limitations for the period of October
2019-August 18, 2020 fails as a matter of law. ..................................... 17

        5.   UPS's direct threat affirmative defense fails as a matter of law.............. 19

    C.   Conclusion .................................................................................................. 20

PRAYER.............................................................................................................................. 20

CERTIFICATE OF SERVICE............................................................................................. 21

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                                                             Page(s)

*Albertson's, Inc. v. Kirkingburg,*
   527 U.S. 555 (1999) ........................................................................................................ 14

*Baert v. Euclid Beverage, Ltd.,*
   954 F. Supp. 170 (N.D. Ill. 1997) ................................................................................. 14

*Banks v. Gen. Motors, LLC,*
   81 F.4th 242 (2d Cir. 2023) ........................................................................................... 18

*Bates v. UPS,*
   511 F.3d 974 (9th Cir. 2007) ......................................................................................... 16

*Bemesderfer v. UPS,*
   2023 WL 8004428 n.3 (M.D.Fl. Nov. 17, 2023) ...................................................... 6, 7

*Burrell v. Crown Cent. Petroleum, Inc.,*
   255 F. Supp. 2d 591 (E.D. Tex. 2003) .......................................................................... 18

*Celestine v. Petroleos De Venezuela SA,*
   108 Fed. Appx. 180 (5th Cir. 2004) ........................................................................ 2, 18

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ......................................................................................................... 8

*Clark v. Champion Nat'l Sec., Inc.,*
   952 F.3d 570 (5th Cir. 2020) ........................................................................................... 8

*Clark v. Olinkraft, Inc.,*
   556 F.2d 1219 (5th Cir. 1977) ........................................................................... 2, 17, 18

*Croy v. Cobe Labs., Inc.,*
   345 F.3d 1199 (10th Cir. 2003) ..................................................................................... 18

*EEOC v. LHC Grp., Inc.,*
   773 F.3d 688 (5th Cir. 2014) ........................................................................................... 9

*Envtl. Conservation Org. v. City of Dallas,*
   *Tex.*, 529 F.3d 519 (5th Cir. 2008) ................................................................................. 8

*Hatter v. WMATA,*
   244 F. Supp. 3d 132 (D.D.C. 2017) ................................................................... 1, 14, 15

*Leisen v. City of Shelbyville,*
   153 F.3d 805 (7th Cir. 1998) ......................................................................................... 14

*Murphy v. United Parcel Serv., Inc.,*
   528 F. Supp. 3d 983 (E.D. Wis. 2021) ............................................................................ 7

*Nall v. BNSF Ry. Co.,*
   917 F.3d 335 (5th Cir. 2019) ..................................................................................... 2, 19

*Nat'l R.R. Passenger Corp. v. Morgan*
   536 U.S. 101 (2002) .................................................................................................... 2, 18

*Rendon v. AT & T Techs.,*
   883 F.2d 388 (5th Cir. 1989) ................................................................................... 18, 19

*Rodriguez v. ConAgra Grocery Products Co.,*
   436 F.3d 468 (5th Cir. 2006) ..................................................................................... 8, 16

*Sharpe v. Cureton,*
   319 F.3d 259 (6th Cir. 2003) ......................................................................................... 18

Statutes

42 U.S.C. § 12102 ........................................................................................................ 1, 9
42 U.S.C. § 12111 ..................................................................................................... 1, 9, 13
42 U.S.C. § 12112(a) ................................................................................................... 8, 15
42 U.S.C. § 12112(b) ....................................................................................................... 16
42 U.S.C. § 12113(b) ....................................................................................................... 19
49 U.S.C. § 31315(b)(5) .................................................................................................. 20

Rules

Federal Rules of Civil Procedure 56(a) ............................................................................ 8

Regulations

29 C.F.R. § 1630 ............................................................................................................... 2
29 C.F.R. § 1630.2 ..................................................................................................... 11, 19
29 C.F.R. § 1630.2(n) ....................................................................................................... 9
49 C.F.R. § 391.41(a)(3) ................................................................................................... 3

Other Authorities

87 Fed. Reg. 34747 (FMCSA June 7, 2022) ............................................................... 5, 13
89 Fed. Reg. 59967 (FMCSA July 24, 2024) .............................................................. 5, 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| **GABRIEL BRANDON GARZA,** | |
| **Plaintiff,** | **Civil Action No.  1:23-cv-00097** |
| **v.** | |
| **UNITED PARCEL SERVICE, INC.,** | **Jury Trial Demanded** |
| **Defendant.** | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Brandon Garza ("Garza") files this Motion for Partial Summary Judgment on his claims against Defendant United Parcel Service, Inc. ("UPS") and requests the court to grant summary judgment in Garza's favor on the following issues:

### I. Issues in Dispute

**A. Issue #1: There is no material fact issue that Garza has a disability.** Garza's deafness is a disability within the ADA's definition, because it substantially limits him in the major life activity of hearing. 42 U.S.C. § 12102.

**B. Issue #2: There is no material fact issue that at all relevant times, Garza was qualified**. 42 U.S.C. § 12111; *Hatter v. WMATA*, 244 F. Supp. 3d 132, 136 (D.D.C. 2017). Garza was able to meet all requirements to work as a driver, including obtaining a hearing exemption, training for the position, and communicating, with reasonable accommodations, at all relevant times. UPS's now allowing these accommodations for drivers proves, as a matter of law, that these accommodations are reasonable.

**C.  Issue #3: There is no material fact issue that UPS discriminated against Garza, refusing to allow him to work as a driver, because of his disability.** Pursuant to UPS's policy prohibiting

1

the acceptance of hearing exemptions, an unlawful qualification standard that screens out individuals who are deaf and unable to pass a hearing test on the basis of their disability, UPS consistently denied Garza's bids and refused to hire him in the driver position for several years, and consistently hired individuals junior to Garza instead.

**D. Issue #4: UPS's affirmative defense of limitations for the period October 2019-August 19, 2020 fails.** Garza's complaints of discrimination under UPS's policy banning deaf individuals from driver positions are not time-barred during the period before August 19, 2020 (300 days before Garza filed his charge on September 15, 2021), under the continuing violation doctrine. *Clark v. Olinkraft, Inc.*, 556 F.2d 1219, 1222 (5th Cir. 1977). *Nat'l R.R. Passenger Corp. v. Morgan* did not address or overrule prior law holding that a discriminatory policy can be a continuing violation. 536 U.S. 101, 114 (2002); *Celestine v. Petroleos De Venezuela SA*, 108 Fed. Appx. 180, 187 n.9 (5th Cir. 2004).

**E. Issue #5: UPS's affirmative defense of direct threat fails**, because Garza has shown himself able to perform the job without creating any substantial safety risk, and because UPS failed to conduct the required individualized assessment of Garza's ability to safely perform the essential functions of the job, and disregarded the best available medical evidence. 29 C.F.R. § 1630)(r); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 342 (5th Cir. 2019).

## II. Undisputed Facts

This is a disability discrimination case. Garza is deaf. [Ex. A at 16:9-14]. He communicates through ASL as well as written English. [Ex. A at 16:15-17:16]. Garza was hired in January 2012 as a preloader in UPS's Brownsville, Texas facility. [Ex. A at 16:6-8]. From January 2012 until June 2024, Garza worked for UPS in non-driver, part time positions. [Ex. A at 28:5-17, 29:7-11]. Garza's dream job, for over 12 years, has been to work as a driver for UPS. [Ex. A at 195:4-6]. However, under UPS's policy, UPS continuously passed over Garza for driver positions because

2

of his disability and promoted junior employees to driver positions ahead of Garza. [Ex. A at 137:4-19, 143:1-16, 144:8-16]. UPS's policy, put officially in writing in October 2019, was to not accept hearing exemptions from the FMCSA and therefore to not hire any deaf individual as a driver who could not obtain a DOT card without a hearing exemption, despite their being physically qualified to drive under the law. [Ex. L].

FMCSA standard

Drivers of UPS's package trucks over 10,000 lbs. must undergo the DOT medical exam and obtain a DOT card. There is no reliable evidence that hearing impairment has any effect on motor vehicle crash risk, and the situation has not changed since 2008, when the FMCSA published a review of the scientific literature reporting that the best studies available did not find a correlation between hearing impairment and increased crash risk. [Ex. L (Expert Report of Dr. Jamie Dow), p. 3, 5]. Accordingly, since 2013, the law has allowed drivers who cannot meet the hearing standard in the medical exam to obtain a DOT card with a hearing exemption issued through the FMCSA. 49 C.F.R. § 391.41(a)(3). However, UPS implemented an unlawful qualification standard by refusing to accept FMCSA hearing exemptions. [Ex. L]. UPS's unlawful policy continued in effect until January 2024. [Ex. G at 43:9-17].

The bid process

UPS posts available jobs for its employees to bid on before the beginning of each quarter, for 10 days. [Ex. F at 40:2-9; Ex. E at 19:12-20:16]. These jobs include part time driver positions including air driver and temporary cover driver ("TCD"); and full time driver positions. [Ex. F at 15:2-25, 20:15-21, 18:16-18, 21:5-14]. Air drivers drive smaller vans, while TCDs and full time drivers drive the brown package trucks. [Ex. B at 18:23-19:16, 20:7-10, 15:10-16:21]. While the other bids go up every quarter, TCD bids only go up if an available position exists. [Ex. F at 39:20-40:1, 44:13-19].

3

Employees are selected for driver bids in order of seniority. [Ex. F at 37:14-23; Ex. E at 16:20-23]. The most senior person who signed the bid list is contacted first. [Ex. F at 37:19-23; Ex. E at 56:16-58:8]. If she wants the bid position, she is sent to UPS's preferred clinic, Valley Day & Night Clinic, to take the DOT medical exam and obtain a DOT card, with UPS covering the cost of the medical exam. [Ex. D at 78:19-79:6; Ex. G at 42:5-21; Ex. W at 33:22-35:10; Ex. E at 59:22-60:5]. Then the driver candidate is sent to pass (1) a preliminary road test and (2) five days of formal training at UPS's in-house Integrad training facility. [Ex. F at 37:25-38:5]. Upon successfully passing all these, the new driver goes through 25 days of on-the-job training. [Ex. F at 38:4-6; Ex. E at 8:14-9:6].

<u>UPS passed Garza over for bid positions based on its policy of refusing to accept deaf candidates for driver positions, and did not mention "FMCSA hearing exemption" until after Garza got a lawyer.</u>

In October 2019, UPS issued its formal written policy that prohibited accepting FMCSA hearing exemptions, and HR accordingly communicated to the local supervisors at Brownsville, including Norma Lujano, Safety Supervisor, and Felix Bennett, Driver Supervisor, that under UPS's policy, Garza was not able to get any hearing exemption or waiver that UPS would accept. [Ex. D at 121:1-19; Ex. P; Ex. L].

No-one at UPS ever mentioned "FMCSA" or the availability of a hearing exemption to Garza until June 2021, shortly after Garza retained counsel and started asking for copies of all the bid lists he had signed. [Ex. K; Ex. A at 59:6-14]. Instead, Garza's supervisors informed him that the only way for him to become a driver was to pass the DOT medical exam, which he could not do. [Ex. E at 41:11-20].

Only in June 2021, Labor Manager Daniel Kaehn communicated through the union representative that Garza needed to apply for an "FMCSA accommodation," but UPS still refused to explain to Garza what the process was to obtain or apply for an "FMCSA accommodation." [Ex.

K]. After researching with the assistance of counsel, Garza applied for an FMCSA hearing exemption in January 2022 and received a DOT card with the FMCSA hearing exemption in June 2022. [Ex. A at 115:13-16, 115:20-23]. The FMCSA's decision to exempt Garza was based, first of all, on "current medical information and literature, and the 2008 Evidence Report regarding hearing and commercial motor vehicle safety, which found that the evidence does not support the contention that individuals with hearing impairment are at an increased risk for a crash." 87 Fed. Reg. 34747 (FMCSA June 7, 2022). Additionally, the FMCSA found that Garza's driving record demonstrated a safe driving history. [*Id.*] The FMCSA has since renewed Garza's hearing exemption, effective June 3, 2024. 89 Fed. Reg. 59967, 59967-8 (FMCSA July 24, 2024).

Garza signed all bids that he was informed of since 2016, without exception.

Since 2016, Garza has bid on all driver positions, part time and full time, that he was aware of. [Ex. A at 80:1-5, 82:22-83:16]. "If I ever saw it myself or somebody told me that it was open, [] I would sign." [Ex. A at 82:22-83:2]. Bennett agrees that Garza was "pretty consistent" at checking the bids throughout his employment. [Ex. E at 55:11-21]. If Garza did not sign a bid, it was because he was not accommodated and timely given notice that bids had been posted, unlike his coworkers who were not deaf. [Ex. A at 84:10-18, 85:6-7]. Supervisors inform UPS's employees at regular PCM meetings of information they need to know, including whenever bids are posted, but Garza did not have a translator and instead had to ask either his supervisor or coworkers about what was conveyed and discussed in the PCM meetings. [Ex. A at 24:1-26:17, 85:6-7]. Garza regularly received only partial information and did not get all the information conveyed in these meetings. [Ex .A at 24:19-26:2].

UPS continuously blocked Garza from driving and passed him over for driver jobs.

UPS continuously passed over Garza and failed to even notify him of driver opportunities for which he was senior bidder, since 2016. [Ex. A at 54:16-19]. Therefore, Garza is not aware of

all of the jobs that he was passed over and lost out on due to UPS's discriminatory policy, since 2016. UPS does not track TCDs in its seniority listing reports. [Ex. F at 69:20-70:3]. Further, UPS's recordkeeping regarding bid lists is spotty. Whole years of bid lists, including 2017 and 2019, are missing from UPS's production.[1] [Ex. I at D-BG 1821-1822, 1838-1839, 1858-1859 (skipping from 2016 to first quarter 2018, from first quarter 2018 to first quarter 2020, and from third quarter 2020 to fourth quarter 2021]. Finally, Brownsville management does not document or track who was called and informed that they are next in line for a bid, nor which individuals were called and declined bids they had signed up for. [Ex. E at 63:6-21].

However, we know that in 2017, UPS hired two full time drivers, both junior to Garza (Ex. J at D-BG 2041; Ex. E at 50:24-51:1); that in 2018, UPS hired 7 full time drivers, all of whom were junior to Garza (Ex. J at D-BG 2041; Ex. E at 52:3-19, 69:15-70:3); that in 2019, UPS hired 4 full time drivers, two of whom was junior to Garza (Ex. J at D-BG 2041; Ex. E at 70:11-20); that in 2020, UPS hired at least two TCDs and 14 full time drivers, the vast majority of whom were junior to Garza (Ex. J at D-BG 2041; Ex. E at 70:21-72:3, 73:23-74:6; Ex. I at D-BG 1842 (showing a TCD bid list with the notation "Need 2"); that in 2021, UPS hired at least three part time drivers who were junior to Garza (as disclosed in UPS's position statement, (Ex. O at D-BG 1051, footnote 3, which explains that UPS hired three drivers in the first half of 2021 who had seniority dates junior to Garza's); that in 2022, UPS hired Joel Cortez, who was junior to Garza, in a full time driver position, as well as at least one TCD in 2022 (Ex. I at D-BG 1897-1901; Ex. J at D-BG 2041; Ex. E at 76:16-77:5); and that in 2023, UPS hired at least 6 air drivers, all of whom

---

[1] This was not an isolated practice at Brownsville. Other UPS locations, involved in similar lawsuits, also failed to keep reliable bid records. *Bemesderfer v. UPS*, 2023 WL 8004428, at *3 n.3 (M.D.Fl. Nov. 17, 2023) (noting UPS' lax recordkeeping regarding bid sheets).

were junior to Garza, as well as at least one TCD. [Ex. J at D-BG 2041; Ex. E at 10:20-11:15; Ex. I at D-BG 1981-1985].[2]

UPS finally revoked its discriminatory qualification standard in 2024.

In January 2024, after multiple lawsuits were filed challenging UPS's discriminatory policy, including this one, UPS finally reversed its discriminatory policy.[3] [Ex. G at 43:9-17]. UPS currently allows driver candidates to apply for and obtain FMCSA hearing exemptions during its onboarding and training process for drivers. [Ex. R at D-BG 10304, 10306; Ex. S at D-BG 10585].

In June-July 2024, Garza was finally allowed to take the road test, attend Integrad training, and returned to Brownsville for 25 days of on the job training, and passed all training and requirements. [Ex. A at 31:3-35:25]. Garza was able to be accommodated through the simple accommodations of having an interpreter available for training communications while the truck was stopped, and communicating through a set of hand signals while the truck was in motion. [Ex. B at 39:23-40:19, 43:3-45:6; Ex. A at 31:22-32:13]. Garza currently holds the position of TCD, since July 2024. [Ex. A at 29:22-30:17].

UPS agrees that allowing deaf drivers to communicate through the use of notes, talk to text applications, and if desired, having a customer call and speak with UPS's business manager is an effective, reasonable accommodation. [Ex. B at 49:13-18, 47:8-50:3, 77:23-78:22]. UPS, since 2024, now trains deaf drivers to use these communication methods as a reasonable accommodation

---

[2] The seniority dates are shown in the fourth column of the Seniority Listing Report, marked "union seniority attainment part time date." [Ex. E at 46:5-20]. Garza's is fifth from the top on page 2, which lists the part time non-drivers at Brownsville in order of seniority date, and Garza's seniority date as shown here is 2/13/2012. [Ex. J at D-BG 2042; Ex. E at 50:17-23]. Page 1 of the report (D-BG 2041) lists the full time drivers in order of date promoted to full time (shown in column 1), and then part time air drivers in order of seniority date (shown in column 4). [Ex. J at D-BG 2041; Ex. F at 41:4-42:5, 15:2-25]. The dates of promotion to an air driver position, for the part time drivers, are shown in column 5 (job profile start date). [Ex. F at 43:15-43:24]. The last 6 drivers promoted to an air driver position got that job in 2023 as shown in this report. [Ex. F at 43:24-44:3; Ex. J at 2041]. The seniority listing report produced by UPS does not show which full time drivers previously received part time driver positions. [Ex. F at 44:5-11]. It also does not reflect any TCD positions. [Ex. F at 69:20-22].

[3] See, e.g. *Bemesderfer v. United Parcel Serv., Inc.*, 2023 WL 8004428, at *2 (M.D. Fla. Nov. 17, 2023); *Murphy v. United Parcel Serv., Inc.*, 528 F. Supp. 3d 983 (E.D. Wis. 2021).

for their disability. [Ex. B at 47:8-50:3, 77:23-78:22]. Despite UPS's official policy, at least five deaf drivers were driving for UPS and using these alternative methods of communication for several years prior to 2024. [Ex. B at 74:24-76:1, 77:17-22; Ex. Q; Ex. G at 99:7-11].Garza does the same now. [Ex. A at 29:22-30:17]. UPS's own trainer admits there was no reason why Garza could not have been accommodated to drive at any time during the last several years. [Ex. B at 86:1-9, 49:19-50:8].

## III. Argument

### A. Standard of Review

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only then does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).

### B. Disability discrimination standard

The ADA forbids a covered employer from discriminating against a "qualified individual with a disability on the basis of that disability." 42 U.S.C. § 12112(a); see *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020). To establish his disability discrimination claim, Garza must establish that he had a "disability" within the meaning of the ADA; (2) he was qualified for the position for which he sought employment; and (3) he was not hired because of his disability. *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 474 (5th Cir. 2006).

**1. Plaintiff had a disability.**

Garza is completely deaf. [Ex. A at 16:9-14]. Garza's deafness is a disability within the ADA's definition, because it substantially limits him in the major life activity of hearing. 42 U.S.C. § 12102.

**2. Plaintiff was qualified at all relevant times to work as driver.**

Garza is entitled to summary judgment on the issue of whether he is a qualified individual within the meaning of the ADA who can perform all essential functions of the driver position. There are no material facts in dispute.

To show that he is qualified for the driver position, Garza must show that he could perform the essential functions of the job or that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)); *see* 42 U.S.C. § 12111(8).

UPS asserted in its Interrogatories that Garza could not perform the following essential functions of the driver position:

> Generally, the qualification standards for a UPS package car and feeder driver include, among others, the ability to hear and speak, as drivers must be able to communicate with other employees, customers, public safety personnel, and members of the general public in the performance of their essential job functions. UPS driving candidates also must be able to complete UPS's intense, state-of-the-art, and specially designed driver training program, which relies on real-time verbal coaching and feedback while driving and necessitates candidates to hear and communicate in spoken English.

[Ex. H at 7].

UPS is mistaken in calling "the ability to hear and speak" an essential job function, because these are not job duties. Essential job functions means "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n). Garza undoubtedly is able to perform all essential functions of the driver position, because he is doing it now.  In June 2024, two years after Garza first received his hearing exemption, Garza was

finally sent for driver training and passed all aspects of the driver training, and since July 2024 has

held the position of temporary cover driver (TCD). [Ex. A at 31:3-35:25, 29:22-30:17].

**a. At all relevant times, Garza could have completed training with reasonable accommodations.**

UPS's specific allegation that UPS driving candidates must be able to hear and

communicate in spoken English to complete its training program is not true. In 2024, UPS

established that it was reasonable for it to accommodate driver candidates to attend training

through the use of hand and finger signals while the truck was in motion and otherwise through

the use of an interpreter. [Ex. B at 39:23-40:19, 43:3-45:6, 36:8-37:9]. When the truck is not in

motion, the interpreter comes up to the cab and interprets in ASL. [Ex. B at 36:8-37:9]. It is

undisputed that all of the classroom portion of the training is successfully accommodated via an

ASL interpreter and transcription/closed caption. [Ex. B at 32:10-34:14; Ex. G at 121:20-24]. This

has been UPS's standard practice since 2024, and Garza and others have been successfully trained

using this process. [Ex. A at 31:3-35:8].

Further, even before 2024, UPS previously successfully trained at least five deaf driver

candidates who have driven for UPS for several years. [Ex. G at 120:25-121:4; Ex. Q].

Accordingly, deaf driver candidates, including Garza once he was finally allowed to, have

successfully completed UPS's training program with the low-tech, low-cost accommodations of

having an ASL interpreter present and using hand and finger signals.

**b. At all relevant times, Garza could have been reasonably accommodated to meet all communication requirements for the position.**

In 2024, UPS also started training deaf driver candidates and officially allowing deaf

drivers, as a reasonable accommodation, to communicate with customers, with the general public

and in safety situations using the following methods: (1) through written notes; (2) using a talk to

text app on their phone; and (3) if preferred, calling their supervisor or the business manager to

have an oral conversation with the customer or other individual. [Ex. B at 47:8-50:3, 77:23-78:22]. All these methods have been available for the past several years; specifically, UPS' corporate representative is aware that speech to text software has been around at least since 2017. [Ex. B at 49:19-50:8]. UPS considers these methods as sufficiently accommodating the ability of a deaf person who requires ASL interpretation to perform the essential function of communication in the driver position. [Ex. B at 49:13-18]. Further, at least some deaf drivers who have driven successfully for UPS have already been using these communication methods for several years. [Ex. B at 74:24-76:1, 77:17-22]. Accordingly, there is no reason why UPS could not have allowed these accommodations to Garza prior to 2024, and no reason why Garza could not have performed all essential functions of the position prior to 2024. [Ex. B at 86:1-9].

### c. At all relevant times, Garza met the job-related requirement of being able to obtain a DOT card with a hearing exemption during onboarding.

Under 29 C.F.R. § 1630.2, "qualified" also means that the individual "satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires." However, UPS job-related requirement at issue is that the driver candidate must be able to obtain a DOT card though the onboarding process—not that driver candidates must already hold one. [Ex. D at 78:19-79:6; Ex. G at 42:5-21; Ex. W at 33:22-35:10; Ex. E at 59:22-60:5].

UPS has never required driver candidates to have previously received a DOT card. Rather, after UPS notifies the senior bidder, who at that point becomes a driver candidate, that they are next in line for the position, UPS then sends the driver candidate, at UPS's expense, to UPS's approved clinic to take the DOT medical exam and obtain the DOT card. [Ex. D at 78:19-79:6; Ex. G at 42:5-21; Ex. W at 33:22-35:10; Ex. E at 59:22-60:5]. After they obtain the DOT card they are scheduled for a road test and sent for training. [Ex. F at 37:25-38:56; Ex. E at 8:14-9:6].

Since UPS changed its policy to accept FMCSA hearing exemptions in 2024, UPS now allows driver candidates to obtain their hearing exemption as part of the onboarding and training process. UPS's current process for hiring new drivers who require a hearing exemption, as disclosed in its training documents, modifies this process as follows: first, the employee must sign a bid and the senior bidder is awarded the bid and notified that they are a driver candidate. [Ex. R at D-BG 10306; Ex. S at D-BG 10585]. Once notified, driver candidates are sent to complete the DOT medical exam and then to apply for the hearing exemption. [Ex. R at D-BG 10304, 10306; Ex. S at D-BG 10585]. Then, as soon as they receive their FMCSA hearing exemption, driver candidates are then scheduled for a road test and subsequently sent for training. [*Id*]. If they pass training and all other requirements, they are then hired. [Ex. F at 38:1-9].

Whether UPS's current process for onboarding hearing impaired drivers is accurately defined as a reasonable accommodation or simply as UPS's standard process, it is clear that if UPS had accepted hearing exemptions prior to 2022 as it does now, Garza would be qualified and would have met all requirements in due course through UPS's driver candidate testing and training process. Allowing Garza, as a driver candidate, the extra time to apply for and receive a hearing exemption before being sent for training would clearly be a reasonable accommodation, because UPS does it now as a matter of course.

At any time when Garza applied for driver positions, UPS could have allowed Garza the chance to go get his hearing exemption. But UPS did not communicate this to Garza. [Ex. A at 59:6-14; Ex. D at 121:1-19; Ex. E at 41:11-20]. Instead, per UPS's policy, UPS's HR representative told Garza's supervisors that he was not eligible for any waiver and that he had to pass the DOT medical exam, and Garza's supervisors in turn told Garza that he had to be able to pass the DOT medical exam to work as a driver. [Ex. D at 121:1-19; Ex. E at 41:11-20; Ex. P; Ex. L].

Had Garza been informed that he could obtain the DOT card with an FMCSA hearing exemption, he would have been qualified to do so based on his driving record. In 2022, the FMCSA approved Garza upon review of his driving record and found, on the basis of his driving record which included a speeding ticket during the prior three years, that he had an adequately safe driving record. 87 Fed. Reg. 34747, 34748 (FMCSA June 7, 2022); [Ex. T at GARZA 211-214]. In 2024, the FMCSA reapproved Garza for a hearing exemption upon review of his driving record and found, on the basis of his driving record which included two speeding tickets and one accident during the prior three years, as well as a citation for unsafe lane change in an accident in 2015, that he had an adequately safe driving record. 89 Fed. Reg. 59967, 59967-8 (FMCSA July 24, 2024); [Ex. U at GARZA 232-239]. Garza has held a driver's license since 2011 and his driving history prior to 2018 is consistent with his driving history from 2018-2024. [Ex. A at 99:4-13, 102:4-14, 103:15-19; Ex. U at GARZA 232-239]. Accordingly, if Garza had applied for an FMCSA hearing exemption prior to 2022, he would have been approved, based on his driving history and based on the FMCSA's finding, based on a review of the medical information and literature and the 2008 Evidence Report, that the evidence does not support the contention that individuals with hearing impairment are at an increased risk for a crash. 87 Fed. Reg. 34747.

Therefore, Garza was qualified and able to fulfill all requirements of his position at all times, including obtaining a DOT card with an FMCSA hearing exemption, just as soon as UPS gave him the opportunity. However, UPS never gave Garza that opportunity. Instead, UPS repeatedly passed Garza over for promotion while hiring junior applicants for driving positions, and misinformed him for many years.

An employee is "qualified" under the ADA if they are able to perform the essential functions of the job with or without reasonable accommodation. 42 U.S.C. § 12111. If an employee is not physically or otherwise able to pass or obtain a required exam or license which is required

for performance of an essential job function, their inability to perform that essential job function may render them not qualified, making the real inquiry: if they are able to do so with or without reasonable accommodation. *Hatter v. WMATA*, 244 F. Supp. 3d 132, 136 (D.D.C. 2017) (denying summary judgment on the "qualified" prong, although the plaintiff had not yet obtained the DOT medical certification required to work as a bus operator, because "the defendant has not presented any evidence that Plaintiff could not obtain this certification, and there is no evidence the Plaintiff could not operate a bus."); *Leisen v. City of Shelbyville*, 153 F.3d 805, 808 (7th Cir. 1998) (finding that where the plaintiff repeatedly tried and failed over three years to obtain paramedic certification, she was not qualified and further attempts at accommodation would have been futile); *Baert v. Euclid Beverage, Ltd.*, 954 F. Supp. 170, 173 (N.D. Ill. 1997), *rev'd on other grounds*, 149 F.3d 626 (7th Cir. 1998) (finding that the plaintiff was not qualified because he not only did not have a CDL but could not get one, even though he was given a year to try to apply and seek a waiver first). Accordingly, "The Senate Labor and Human Resources Committee Report on the ADA stated that "a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999).

Of the above cited cases, *Hatter* is especially on point. In *Hatter*, the plaintiff started but abandoned the medical certification process due to the defendant's informing him that any indication that he had sleep apnea would be disqualifying. *Hatter*, 244 F. Supp. 3d at 137 (D.D.C. 2017). His sleep apnea (like Garza's deafness) would not have prevented him from completing the certification process, however, and the court therefore found that the defendant had not met its burden to show that the plaintiff was not qualified, because it presented no evidence that the

plaintiff was not able to complete the required certification process. *Hatter*, 244 F. Supp. 3d at 136.

Accordingly, the evidence shows that at all relevant times, Garza was able to obtain a hearing exemption and would have qualified for a hearing exemption upon his applying for one, based solely on (1) his safe driving record, (2) the fact that he otherwise passed the DOT medical exam in all respects other than hearing, entitling him to a DOT card with a hearing exemption, and (3) the FMCSA's regulations which allow drivers, like Garza, hearing exemptions if they can demonstrate a safe driving history.

The only reason why Garza did not apply for the FMCSA hearing exemption earlier was because UPS repeatedly misled him and gave him false information. Further, even after UPS's Labor Manager finally informed Garza for the first time, in June 2021, that he needed to obtain an "FMCSA accommodation" to apply for driver positions, UPS still refused to give him any more information or assistance with the process. [Ex. K].

Accordingly, Garza shown that he would have previously applied for and obtained a FMCSA hearing exemption and DOT card whenever he was selected as a driver candidate and given the opportunity to do so, as all other drivers (currently including deaf drivers) are allowed to do.

Accordingly, summary judgment is appropriate in Garza's favor that he was qualified for the driver position.

**3. UPS discriminated against Garza, refusing to allow him to work as a driver, because of his disability.**

An employer violates the ADA when it "discriminates against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a). Methods or forms of disability discrimination include not

making reasonable accommodations for the known physical limitations of the individual, limiting opportunities for a job applicant because of their disability, or implementing qualification standards that screen out or tend to screen out an individual with a disability or class of individuals with disabilities. 42 U.S.C. § 12112(b). A qualified individual with a disability must demonstrate that they suffered an adverse employment action because of their disability. *Rodriguez*, 436 F.3d at 474.

The undisputed facts show that Garza suffered adverse action because of his disability. In October 2019, UPS implemented an official written policy regarding FMCSA hearing exemptions. [Ex. L]. UPS's official written policy announced a qualification standard that screened out and refused to hire deaf candidates who did not have the ability to pass the hearing portion of the DOT medical exam and therefore were not able to receive a DOT card without a hearing exemption. [Ex. L]. UPS's qualification standard expressed in this policy is facially discriminatory because "it focuses directly on an individual's disabling or potentially disabling condition." *Bates v. UPS*, 511 F.3d 974, 988 (9th Cir. 2007).

Garza was one such individual blocked from advancement to a driver position under UPS's policy. Although the undisputed facts establish that Garza was qualified to work as a driver, UPS refused to accept Garza's bids and refused to promote him for a driver position since 2019.[4] Instead, UPS consistently passed Garza over and hired individuals junior to Garza. *See supra* discussion and evidence cited at p. 5-7.

UPS's refusal to accept Garza's bids for driver positions pursuant to the October 2019 policy thus constitutes an adverse employment action because it has adversely affected Garza in

---

[4] Garza intends to show at trial that UPS's policy was already in effect and applied against Garza since at least 2016, although the policy was not yet written down. However, for the purposes of this Motion, Garza focuses on the post-October 2019 period because there is no question that UPS had this policy in effect since October 2019.

the hiring to, and advancement to, the driver position that he unsuccessfully sought and applied for throughout the duration of this policy.

Garza applied to every driver position that he was aware of, since 2016. [Ex. A at 80:1-5, 82:2283:16; *see also* Ex. E at 55:11-21]. If Garza did not sign the bid list for a position, it was only because UPS failed to properly accommodate Garza's disability by providing reliable translation in regular PCM meetings, during which everyone else was informed when bid lists went up. [Ex. A at 84:10-18, 85:6-7]. UPS's documentation of bid lists and part time positions awarded is lacking, however Garza can show that he was reliably passed over every year from 2017 until 2024, for multiple driver positions in favor of junior employees, in accordance with UPS's official policy. *See supra* discussion and evidence cited at p. 5-7.

Accordingly, summary judgment should be granted in favor of Garza that he was discriminated against because of his disability.

## 4. UPS's affirmative defense of limitations for the period October 2019-August 18, 2020 fails as a matter of law.[5]

Garza filed his charge of discrimination on June 15, 2021, making 300 days prior August 19, 2020, not September 1, 2020 as erroneously stated by UPS. [Ex. V at GARZA 40]. Garza has shown discrimination since August 19, 2020, however, he also seeks to recover for UPS's continuous violation of the law in denying him promotion prior to August 19, 2020 as well.

Garza does not have to exhaust every specific instance of denied promotion where the discrimination is pursuant to the employer's continuing unlawful policy or practice of discrimination, under the continuing violation doctrine. *E.g., Clark v. Olinkraft, Inc.*, 556 F.2d 1219, 1222 (5th Cir. 1977) (finding the company's discriminatory promotion system to constitute a continuing violation). Under Fifth Circuit precedent on policy-based claims, "there need not be a discriminatory act committed against the plaintiff personally as long as a discriminatory policy

---

[5] See footnote 4.

was in effect and was enforced against a plaintiff or a member of the plaintiff's class during the limitations period." *Burrell v. Crown Cent. Petroleum, Inc.*, 255 F. Supp. 2d 591, 608 (E.D. Tex. 2003); *Clark*, 556 F.2d at 1222; *Rendon v. AT & T Techs.*, 883 F.2d 388, 396 (5th Cir. 1989).

*Morgan* did not eliminate "policy or practice" claims. Circuit courts had previously found two general categories of continuing violation claims: first, where discrete incidents were related in nature; and second, where the plaintiff alleged the operation of a discriminatory policy or system, as in *Clark*. The Supreme Court in *Morgan* overruled the first category, eliminating the continuing violation doctrine where serial, separate adverse actions were merely "sufficiently related" in nature. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). But *Morgan* did not address or eliminate the second category of claims: those regarding a discriminatory policy. *Id.*

"The second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, is not implicated by *Morgan*." *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003); *Celestine v. Petroleos De Venezuela SA*, 108 Fed. Appx. 180, 187 n.9 (5th Cir. 2004) (noting post-*Morgan* that a "systematic policy or practice" could be interpreted as a type of "organized scheme" subject to the continuing violation doctrine); *Burrell*, 255 F. Supp. 2d 591, 608 (holding, post-*Morgan*, that "policy" claims challenging promotional system come under the continuing violation doctrine as long as the policy was in effect and enforced against a member of the plaintiff's class during the limitations period); *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (holding that "discriminatory policy or practice" claims are continuing violations post-*Morgan*); *see also Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1203 (10th Cir. 2003) (the existence of a glass ceiling for women, or in other words a continuous failure to promote the plaintiff because of her gender, was a continuing violation).

18

This makes sense because where a policy categorically blocks promotion for a class of individuals, the plaintiff may not be aware of every instance when he is being denied a promotion pursuant to the discriminatory policy which continuously operates to keep him in a lower position. *Rendon v. AT & T Techs.*, 883 F.2d 388, 396 (5th Cir. 1989). This is the case here for Garza, where UPS repeatedly falsely informed him that he was not eligible for a driver position because he could not pass the DOT medical exam, continued to deny Garza the opportunity to hear of bid and promotion opportunities, and failed to accept Garza's bids based on its unlawful policy.

As such, Garza has shown a continuing violation, prior to August 19, 2020 as well as since, for which he continues to suffer damages. Summary judgment should be granted in Garza's favor on UPS's affirmative defense of limitations, during the period October 2019-August 18, 2020.

**5. UPS's direct threat affirmative defense fails as a matter of law.**

The ADA creates an affirmative defense for employers who can prove that the plaintiff, if hired, would pose a direct threat to the health or safety of other individuals in the workplace, or to themselves. 42 U.S.C. § 12113(b); 29 C.F.R. § 1630.2(r). A direct threat is a "significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630(r). The direct threat defense must be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence," and upon an expressly "individualized assessment of the individual's present ability to safely perform the essential functions of the job[.]" *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 342 (5th Cir. 2019).

Garza does not pose a direct threat to himself or others as a driver, as shown by his successfully passing all driver training on his first attempt and currently driving for UPS for the last five months. [Ex. A at 31:3-35:25, 29:22-30:17]. Further, UPS admits that Garza is able to meet all communication needs through the reasonable accommodations currently allowed to him

and other deaf drivers at UPS. [Ex. B at 47:8-50:3, 77:23-78:22, 49:13-18]. Garza has also established that at all relevant times, he met the FMCSA's driving safety standard and would have qualified for an FMCSA hearing exemption, which represents the FMCSA's determination that allowing him to drive with a hearing exemption "would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption." 49 U.S.C. § 31315(b)(5).

Further, UPS did not rely on the most current medical knowledge and/or the best available objective evidence, and did not conduct any individualized assessment of Garza's ability to safely perform his job, with or without reasonable accommodation. UPS admits it never performed any individualized assessment of Garza. [Ex. G at 125:17-126:4; 100:19-101:2, 119:17-23]. The most current medical knowledge and the best available evidence, at all times at least since 2016, has been that there is no evidence that demonstrates that hearing impairment affects driving safety. [Ex. N at 5]. The best available evidence, ever since 2008, has not found a correlation between between hearing impairment and crash risk. *Id.*

Accordingly, UPS cannot prevail on its direct threat affirmative defense as a matter of law.

## C. Conclusion

Garza requests the Court to grant summary judgment in Garza's favor on all elements of Garza's disability discrimination claim, as well as on UPS's affirmative defense of limitations during the period of October 2019-August 18, 2020, and UPS's affirmative defense of direct threat.

**PRAYER**

Plaintiff Brandon Garza prays that the Court grant Plaintiff's Partial Motion for Summary Judgment.

Respectfully submitted,

SHELLIST LAZARZ SLOBIN LLP

*/s/ Dorian Vandenberg-Rodes*
Todd Slobin
State Bar No. 24002953
tslobin@eeoc.net
Dorian Vandenberg-Rodes
State Bar No. 24088573
drodes@eeoc.net
11 Greenway Plaza, Suite 1515
Houston, Texas 77046
(713) 621-2277 (Tel)
(713) 621-0993 (Fax)

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served in accordance with the Federal Rules of Civil Procedure on December 12, 2024 to all counsel of record.

*/s/ Dorian Vandenberg-Rodes*
Dorian Vandenberg-Rodes